**MILLER FRANK JOHNSON, et al.,**

        **Plaintiffs,**

**v.**                                **Case No. 8:87-cv-369-T-24TBM**

**GEORGE H. SHELDON,**

        **Defendants.**

_____/

## REPORT AND RECOMMENDATION

      THIS MATTER is before the court on referral by the Honorable Susan C. Bucklew

for a Report and Recommendation on **Defendant's Dispositive Motion to Exit Suncoast**

**Region, Districts 8, 14 & 15 From Consent Decree Pursuant to Compliance With Exit**

**Criteria** (Doc. 1565) and **Defendant's Supplemental Motion to Exit Consent Decree,**

**Dissolve Injunctions Contained in Final Judgment, Vacate Remaining Consent Decree**

**Paragraphs 2, 35, 37 and Stipulation Regarding Exit Criteria, Terminate Jurisdiction**

(Doc. 1577).  By its motions, Defendant urges that it has achieved substantial compliance

with the exit criteria such that the court may terminate the Consent Decree Between Plaintiffs

and Defendants ("Consent Decree") (Doc. 68) and court-ordered monitoring thereunder and

bring an end to these lengthy proceedings.[1]  Plaintiffs have filed responses in opposition

---

[1]The Consent Decree was originally filed June 9, 1989.  (Doc. 68).  By Order dated
June 3, 2002, the court terminated all provisions of the Consent Decree except those related to
the Defendant's community compliance obligations and the Community Compliance Exit
Criteria.  *See* (Doc. 1445).

(Docs. 1567, 1582). Additionally, the Monitor has filed reports, including those setting her

findings on the 2006-2007 and 2008 compliance reviews by the Defendant (Docs. 1573, 1576,

1597, 1605), and the parties have filed responses thereto (Docs. 1581, 1599, 1600, 1606,

1607). For the reasons set forth below, I recommend that the motions be GRANTED in part.


I.

At issue on Defendant's motions is whether the Suncoast Region and Districts 8, 14,

and 15 have complied with the exist criteria set forth in the Stipulation Regarding Exit

Criteria ("Stipulation") of February 1993,[2] as modified by the court's Order (Doc. 1551) of

March 19, 2004, such that they may exit the Consent Decree and end this litigation.

The Community Compliance Exit Criteria ("Exit Criteria"), which were initially

filed as an exhibit to the Stipulation, are as follows: (1) the class member was placed in the

community in a less restrictive setting than G. Pierce Wood Memorial Hospital ("GPW")

regardless of whether or not intermittent hospitalization was required; (2) the class member's

clinical needs are addressed in the clinical assessments; (3) the class member's functional

needs are addressed in the functional assessment; (4) the class member receives treatment

planning services based upon professional judgment at the level and intensity needed whether

---

[2]As discussed at the hearing conducted September 1, 2009, the original filing of the
Stipulation and Exit Criteria is no longer found in the docket. It appears that the Stipulation
and Exit Criteria were first filed in February 1993 (Doc. 343) and inadvertently stricken by
Order dated July 12, 1994. (Doc. 457). So there is no confusion, on these motions, the
undersigned has looked to the Monitor's reports related to the compliance reviews for 2006-
2007 and 2008, both of which set forth the Exit Criteria in full and the compliance levels
agreed to in the original Stipulation. *See* (Docs. 1573 at 3-5, 1605 at 3-5).

or not intermittent hospitalization is needed; (5) the class member has opportunities to exercise choice based upon available alternatives and to participate in the development of his/her SIP; (6) the class member receives the level and intensity of services, described in the SIP goals, to meet the class members' needs, whether or not intermittent hospitalization is required; and (7) the record contains data and summaries in progress notes at the level of detail necessary to make professional judgments regarding whether or not the class member has made progress.[3]  (Doc. 1605 at 3-5).  Pursuant to the Stipulation, the level of compliance required to exit is defined as:

> (1)  85 percent of all class members will achieve positive results on six of the seven (85%) community compliance areas;
>
> (2)  Each district will exit any individual community compliance area when 85% or more people in the sample meet the requirements of any compliance area(s).  Monitoring will continue for the full sample across all seven community compliance areas until the required performance level of 85% has been achieved in all seven compliance areas.  Monitoring of those compliance areas where the standard has been previously achieved shall be considered technical assistance and any future scores shall not affect the district(s) ability to exit overall; and
>
> (3)  Each district will exit independent of the performance of any other district when the performance criteria stated on (1) and (2) above have been achieved.

(Doc. 1605 at 5).

Utilizing the above criteria, the Monitor has filed yearly reports reflecting on the Defendant's annual compliance reviews and setting forth her conclusions as to whether the

---

[3]Each exit criteria also includes sub-criteria. *See* (Doc. 1605 at 3-5).  The court's order of March 2004 modified a sub-criteria of criterion #1. *See* (Doc. 1551).

Suncoast Region and Districts 8, 14, and 15 have demonstrated compliance in accordance with the Stipulation.  Given the yearly reports filed by the Monitor, the issue here appears rather straight forward and, at first blush, easily resolved.  However, over the course of proceedings this past year, an additional issue has surfaced related to the Defendant's exclusion of class members from its compliance reviews.  As discussed below, the court's conclusions concerning the appropriateness of the exclusions is necessary before addressing whether any district or the Suncoast Region have achieved compliance under the Stipulation such that they may exit the Consent Decree.

## II.

The recent procedural history is a useful means of setting out the issues.

On August 26, 2008, Defendant filed its **Dispositive Motion to Exit Suncoast Region, Districts 8, 14 & 15 From Consent Decree Pursuant to Compliance With Exit Criteria** (Doc. 1565), to which Plaintiffs responded in opposition (Doc. 1567).  In summary, Defendant maintained that because its 2007 community compliance audit revealed that the Suncoast Region ("SCR") and District 14 ("D-14") achieved positive results in 7 of the 7 compliance areas and Districts 8 ("D-8") and 15 ("D-15") achieved positive results on 6 out of 7 (better than the 85% )of the community compliance areas, monitoring should cease, the Consent Decree should be vacated, and the court's supervision should end.  (Doc. 1565).  Plaintiffs opposed Defendant's motion because of its exclusion of class members from the compliance reviews either because they had refused treatment or because they had moved out of the district.  While agreeing in principle that exclusion is appropriate in some

circumstances, Plaintiffs specifically objected to Defendant's unilateral decision that class members who refused treatment for more than 90 days or who moved out of district for whatever reason and for whatever period of time were excluded from the compliance reviews. Plaintiffs maintained that such exclusion was improper in light of the court's Order that "refusal of treatment means a refusal of all treatment for a significant period of time." (Doc. 1516 at 2).[4] They urged that if these class members had been included in the compliance reviews the results would likely have been different.

On November 26, 2008, the Monitor filed her report on the 2006-2007 Community Exit Criteria Compliance Reviews. (Doc. 1573). While the Monitor's report confirmed the results claimed by the Defendant in 2007, she too cited an "unresolved issue." *Id.* at 14-15. By her account, the Monitor first learned in 2005 that the Defendant and providers were closing cases and excluding class members from compliance reviews who refused treatment for 90 days even where such person had returned to services. Similarly, they were closing cases and excluding class member from compliance reviews where the member had moved from the district. As set forth in the Monitor's report, her investigation lead to the conclusion that some number of class members, excluded as "refusers," should have been included in the compliance review for 2007.[5] In short, her review of the closed cases/exclusions lead her to

---

[4]When first addressed in January 2003, the court stated, ". . . those patients who move out of the catchment area or who refuse treatment lose their status as class members." (Doc. 1498 at 2).

[5]The Monitor's report addressed the so-called "refusers." While the Monitor believes there is also an issue related to "movers," on advice of her counsel, the court's Order of January 14, 2003, has been given a strict reading insofar as it speaks to those who move from the catchment area and, thus, her focus primarily has been on those class members who were

conclude that eight class members had <u>not</u> refused services for a significant period of time and should have been included in the 2007 compliance reviews (four in the SCR and four in D-15).[6]  In her view, without the inclusion of these persons in the sampling pool, there was no random sampling as required.  Further, it appeared that a re-scoring for the SCR and D-15, including these persons and assuming a worst case scenario of failing scores in each area of review for each of these persons, would result in no change for SCR but would significantly affect the outcome of D-15.

A telephone status conference was conducted December 11, 2008, to address the respective positions of the parties.  At this time, Defendant indicated that the algorithm was again run for D-15 shortly before the hearing, including these persons in the sample, with no change in the end results.  However, because the results had not been shared with Plaintiffs or reviewed by the Monitor, the undersigned requested that the Monitor review Defendant's latest calculations and make a report to the court.  A schedule for supplemental briefs was also entered.

On January 12, 2009, the Monitor filed her Supplemental Report to the 2006-2007 Community Exit Criteria Compliance reviews.  (Doc. 1576).  In sum, her review confirmed that even with the additional people, D-15 achieved positive results on six out of seven of the community compliance areas.

---

closed out for refusing treatment but who returned thereafter to services.  In essence, the Monitor believes "movers" and "refusers" should be treated similarly, but she did not include any information about "movers" in her November 2007 report.

[6]Her view is that each should have been included in the compliance reviews for 2007-2008 as well.

On February 6, 2009, Defendant filed it **Supplemental Motion to Exit Consent Decree, Dissolve Injunctions Contained in Final Judgment, Vacate Remaining Consent Decree Paragraphs 2, 35, 37 and Stipulation Regarding Exit Criteria, Terminate Jurisdiction** (Doc. 1577), to which Plaintiffs filed their supplemental opposition (Doc. 1582). Defendant also filed a supplemental brief chiefly addressing the exclusion issues. (Doc. 1581).

By its supplemental motion (Doc. 1577), Defendant again urges the court to conclude its lengthy supervision under the Consent Decree because the results of the 2007 compliance review establish compliance with at least six out of the seven compliance areas in each district and the SCR. It urges that termination is appropriate because under paragraph 16 of the Stipulation, "upon completion of each individual item contained in the exit criteria, that item shall no longer be monitored. Upon the Defendant's completion of all paragraphs contained in the consent decree, the consent decree and all subsequent orders in the court's jurisdiction shall be terminated."[7] In addition to the results from its 2007 compliance review, as confirmed by the Monitor, Defendant cites to a 2007 report compiled by Clinical Services Management ("CSM"), which broadly determined that the scope and quality of community services provided to class members has expanded, improved, and continued to meet

---

[7]As discussed at the hearing conducted September 1, 2009, the Exit Criteria are no longer found in the docket at Document 403, if they ever were. It appears that the Stipulation was first filed in February 1993 (Doc. 343) and inadvertently stricken by Order dated July 12, 1994. (Doc. 457). So there is no confusion, on these motions, the undersigned has looked to the Monitor's reports related to the compliance reviews for 2006-2007 and 2008, both of which set forth the Exit Criteria in full and the compliance levels agreed to in the original Stipulation. *See* (Docs. 1573 at 3-5, 1605 at 3-5).

professional standards following the closure of GPW in February 2002 and such continued through the time of the review. (Docs. 1577-4 and 5). Defendant files this report in support of its argument that the court may now safely conclude there is no significant likelihood of recurring violations if the Consent Decree is vacated.[8] Based on the substantial compliance with the Exit Criteria as reflected in the 2007 compliance review and given the findings in the CSM report, Defendant urges that, pursuant to Rule 60(b)(5), the Consent Decree be vacated, the injunctions dissolved, and the monitoring, the Stipulation, and the court's supervision be terminated. Citing to *Johnson v. Florida*, 348 F.3d 1334 (11th Cir. 2003), Defendant urges that the court may now safely conclude that the remaining purposes of the decree have been satisfied and there is no reasonable likelihood of a recurring violation of federal law should the Consent Decree be lifted.[9]

In their supplemental opposition (Doc. 1582), Plaintiffs submit that the sole issue in dispute is "whether the Defendant properly excluded almost 25% of the remaining class members from the 2006 and 2007 exit criteria reviews." (Doc. 1582 at 2). By Plaintiffs' argument, the exclusion of class members from the compliance review taints the results and

---

[8]Although not submitted by Defendant for its critique of the Exit Criteria, CSM's report goes further and addresses the continued efficacy of the Exit Criteria. It urges, among other findings, that the Exit Criteria have become outdated in light of more modern assessment tools; they do not provide a method for evaluating whether the system of care is meeting reasonable professional standards; and result in compliance reviews with deleterious consequences. (Docs. 1577-4 at 44-63, 1755 at 1-2).

[9]Quoting *Johnson*, Defendant notes two elements must be satisfied before a consent decree may be lifted, "the court first looks to whether 'the basic purposes of the decree have been fully achieved.' If so, the court must find that 'there is no significant likelihood of recurring violations of federal law once the decree has been lifted.'" 348 F.3d at 1343 (citation omitted).

renders the findings wholly unreliable. They urge the court to find that the exclusionary rules employed by the Defendant are inappropriate, unreasonable, and inconsistent with prevailing professional standards. They suggest that if the excluded class members were included in the audit it might significantly alter the findings and result in compliance percentages below the criteria for terminating the case. More particularly, Plaintiffs urge that Defendant's unilateral decision to exclude any class member who refused treatment for 90 days contravenes the Consent Decree; the letter and spirit of the court's April 10, 2003 Order; federal anti-discrimination laws; and professional standards. They urge that the remaining purpose of the Consent Decree and the Stipulation is to ensure that former residents of GPW receive appropriate care and treatment in the community. Nevertheless, Plaintiffs assert that Defendant has chosen to unilaterally and without professional support declare that class members who refuse treatment for 90 days are no longer members of the class and subject to compliance reviews. Plaintiffs urge the court to accept the Monitor's professional judgment that only those individuals who refuse all treatment for a substantial period of time, that is, at least twelve months, are appropriately excluded.

Plaintiffs also urge that, under the Americans With Disabilities Act, 42 U.S.C. § 12201 *et seq.,* and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the state has an obligation to reasonably accommodate these individuals. They contend that the unreasonably short, one size fits all 90-day period Defendant applied to "refusers" has undoubtedly resulted in the exclusion from the class individuals whose refusal is a manifestation of their disability. They urge that a reasonable accommodation in these circumstances requires the more liberal time frame of one year.

Further, Plaintiffs urge that the 90-day period employed by Defendant is inconsistent with professional standards. In support thereof, they cite to a number of articles and an affidavit by Michael Franczak, Ph.D., which suggest that, because noncompliance with treatment is commonplace among individuals with serious illness, the time frame for exclusion cannot be unduly restrictive. By Dr. Franczak's account, no other public mental health system in the country employs a similar 90-day exclusionary rule, the sole purpose of which can only be to improve the scores in the compliance audit process.[10] In his view, the 90-day exclusionary rule is arbitrary and inconsistent with professional standards. (Doc. 1582-3). Consistent with the court's April 2003 Order, which indicated that persons not competent to refuse treatment could not be excluded from the class, Plaintiffs criticize the exclusionary process employed here because it is not apparent that Defendant determined the mental competence of those excluded to make the treatment decision. They urge that, by the Monitor's closed case review, it is likely that a number of "refusers" were not competent to make the rational decisions on treatment. Additionally, Plaintiffs urge that it is not clear that the refusal of treatment was made, even by those competent to make it, with the knowledge that such might lead to their exclusion of the class. By this argument, Plaintiffs contend that fundamental notions of due process require that, before the government deprives such individual of a substantial benefit, it must provide notice to the individual so that appropriate action may be taken to protect his or her interest.

---

[10]Dr. Franczak also addresses "movers" and indicates that, in his experience in other states, persons who leave the catchment area but return for services remain a part of the class and there is no time frame for re-enrollment

Finally, on the matter of the permanent exclusion of class members who left the catchment area but later returned and sought mental health treatment, Plaintiffs first note that the class definition reads simply, "those patients discharged from GPW into a community treatment facility." (Doc. 1498). While agreeing that the court did indicate that those who moved out of the catchment area lose their status as class members, they urge that those who leave but return to service a short time later should not forfeit their class status or legal rights under the Consent Decree. By their reading of the court's Order, there is no reason to believe that the court intended to exclude a person who moved away from the catchment area but returned shortly thereafter. They urge that Defendant's practice is not reasonable or consistent with the underlying purposes of the decree and professional standards. Lastly, Plaintiffs argue that such restriction violates a class members' right to travel as it conditions the right to a government benefit on his giving up his right to travel. Because Defendant's exclusion of up to 25% of the total number of class members by reason of their refusal of treatment or their moving out of the catchment area substantially alters the compliance review results, Plaintiffs urge that the Defendant's claim that it has satisfied the Exit Criteria and achieved compliance with the purposes of the Consent Decree is unreliable.

Defendant's position on the matter of "refusers" and "movers" is set forth in a supplemental memorandum. (Doc. 1581). Initially, Defendant argues that Plaintiffs have waived their current objections because they did not appeal the court's Order (Doc. 1498) of January 14, 2003, or the Order (Doc. 1516) of April 11, 2003. According to Defendant, Plaintiffs have known since June 2005 that it had excluded class members refusing services

for 90 days but have only recently complained.[11]  Defendant urges that the court's previous statement regarding both movers and refusers is the law of the case and Plaintiff cannot now complain about them.  Because Plaintiffs waited three years to present their objections to the court, and only after years of good faith effort to comply with the Exit Criteria, Defendant urges that Plaintiffs should now be foreclosed from raising these objections as a matter of fairness.

On the merits, Defendant urges that it has conducted its audits in full reliance on the court's unequivocal statement that patients who move from the catchment area lose their status as class members.  As for refusers, Defendant notes that the court clearly stated that refusal of treatment meant refusal of all treatment for a significant period of time.  By its account, there are no national standards for maintaining a case open when a person moves or refuses treatment and, consistent with the generally accepted practice, it has made the decision on case closure based on clinical judgment and not merely due to the passage of time.  Defendant also urges that a class member who refuses all treatment no longer has standing to remain a class member and that class members have a right to refuse treatment and, if they do so for a significant period of time, they lose class membership under the court's prior Order.

On the issue of the appropriate construction of the court's "significant period of time" language, Defendant urges that the Monitor has also been dilatory in suggesting that a

---

[11]Defendant acknowledges that Plaintiffs asked the Monitor to conduct a review of closed class members in January 2006.  The Monitor conducted a review in October 2006 and issued a report to the parties in January 2007.

significant period of time is twelve to fourteen months and she should be barred from raising that view as well. Defendant cites to a Florida administrative rule that permits closure when a person refuses services and does not rescind that decision within 30 days.[12] *See* Fla. Adm. Code § 65e 15.041(2). Regardless, Defendant maintains that cases have not been closed simply by reason of the passage of time and some clinical judgment was brought to bear before a case was closed.[13] Nevertheless, even in the cases where class members have been closed out for refusing treatment or moving, none have been denied further treatment when they returned for services. In practice, Defendants urge that such individuals are deemed "priority clients" and receive priority services from care providers upon their return; whether or not an individual remains a class member is of no consequence to that individual in terms of the services provided by the state.

On April 9, 2009, a hearing was conducted but no evidence was taken. Rather, it was agreed that the Monitor and the Defendant would take a step back to try to capture the

---

[12]From arguments, it appears that this rule was applied to movers and a 90-day period was applied in the case of refusers.

[13]The process for closure does not appear to be disputed. At the hearings on April 9, 2009, and September 1, 2009, Defendant proffered that when a person moved or left the area and/or was unable to be contacted for a period of 30 days or more, the provider would make the clinical judgment as to whether or not to close the case. How that judgment was reached in a given case is not clear. There were some cases in which the provider would help set up treatment for the patient in the new locale before the move. It appears that in other cases, the person just left. Once the decision was made to close the case, it was forwarded to the state Attorney General's office for review to validate it as a closed case. If so validated, it was included in the audit pool as a closed case to be audited and scored during that audit cycle, but not thereafter. Purportedly, a similar process was followed in the case of those refusing services for a period of at least 90 days. *See* (Doc. 1594).

whole picture of refusers and movers and the potential impact on compliance scores if such class members were included in the compliance reviews for 2007.

On June 15, 2009, the Monitor filed her report on the status of class members who were refusers or movers from the catchment area but who returned to services. (Doc. 1597). In summary, after identifying living class members whose cases were closed, the Monitor identified a total of sixteen persons from this group which she recommended for inclusion in the 2007 compliance reviews.[14]  Assuming worst case failing scores for each of these class members, the algorithm was again run by Defendant to determine the overall compliance scores for each district and the SCR.  When these movers and refusers were included, the SCR and D-8 showed positive performance on 6 of 7 criteria or better than 85%.  As for D-14 and D-15, when movers and refusers were included, the results were substantially below compliance levels.  When only refusers, if any, were included, the SCR and each district achieved positive results on 6 of 7 criteria or better than 85%.[15]  As discussed below, there are

---

[14]By the Monitor's review, 16 class members were identified as being improperly excluded – 7 of these were "movers" and 4 were "refusers."  As for 4 others, she could not determine, nor could the Defendant explain, why the case was closed.  As a result, the Monitor included these 4 as refusers.  In the case of one, it was determined that the case had not actually been closed and that person had been considered.  By the Monitor's review, the refusers had all returned to services within 14 months and all but one of the movers in this group had all returned to services within 14 to 16 months.  In her view, all were inappropriately closed and should have been included in the 2007 compliance review and the subsequent reviews.

[15]The Monitor's report contains attachments identifying the 16 individuals recommended for inclusion in the 2007 (and subsequent) compliance reviews.  In her summary, she notes that, using her 12 to 14 month criteria to define a significant period of time, all of the identifiable refusers have returned for services within 14 months and most of the "movers" she recommended for inclusion have returned to the area and services within 14 to 16 months.  The Monitor concluded by urging that the same "significant period of time"

two compliance levels under the Exit Criteria that must be satisfied before a district or the SCR may exit the Consent Decree. Based on Defendant's audit, the SCR and D-14 had reach full compliance with the Exit Criteria and could be withdrawn. Based on the Monitor's position, however, none of the districts or the SCR achieved full compliance and all would remain subject to monitoring.

In response to the Monitor's report, Plaintiffs essentially agreed with her findings and conclusions. (Doc. 1599). Defendant's response, again objected to the opinions and recommendations of the Monitor concerning refusers and movers but not her findings related to the statistical analysis. In any event, Defendant urged that any error in not including these movers (which it does not concede) is surely harmless. Citing to the recent decision in *Horne v. Flores*, 129 S. Ct. 2579 (2009), it urges that the court adopt a flexible approach in its application of Rule 60(b)(5). Given that the record demonstrates that the state has undertaken sweeping modifications and improvements to the community mental health system since the closing of GPW hospital in February 2002, and given that the parties are now quibbling over a mere handful of patients, which the parties dispute should have been included in the 2007 audits and which make little difference to the outcome of that audit, Defendant maintained that a flexible approach dictates that it is time to end this case. (Doc. 1600).

On July 24, 2009, the Monitor filed her report on Defendant's 2008 community exit criteria compliance reviews. (Doc. 1605). Because the audit did not include the additional class members recommended for inclusion by the Monitor, she addressed the data/results as

criteria be employed for both movers and refusers.

actually reviewed and based on a worst case basis assuming failing scores on each criteria for the excluded class members. *Id.* at 6. By the Defendant's review, D-8 showed positive results in 6 out of 7 of the exit criteria; D-14 and D-15 showed positive results in 7 out of 7 of the criteria; and the SCR fell out of compliance scoring 5 out of 7 positive results.[16]

When all the excluded class members identified by the Monitor were included and worst case results assumed, only D-8 achieved compliance with positive results on 6 out of 7 exit criteria; D-14 showed positive results on only 3 out of 7 criteria; D-15 showed positive results on only 5 out of 7 criteria; and SCR showed positive results on 5 out of 7.

When only the refusers, if any, were added and worst case results assumed, the results in D-8 remained the same with positive results on 6 out of 7 exit criteria; D-14 achieved compliance with positive results on 7 out of 7 criteria; D-15 also achieved compliance with positive results on 7 out of 7 of the exit criteria; and the SCR remained unchanged with positive results on 5 out of 7 criteria. In sum, by the Defendant's audit, D-14 (again) and D-15 have achieved full compliance with the Exit Criteria and can withdraw from the Consent Decree. By the Monitor's position, if both movers and refusers are included, only D-8 achieved positive results of 6 of 7 and none could be withdrawn from the Consent Decree. If only refusers were included, D-14 and D-15 achieved full compliance with the Exit Criteria and could be withdrawn from the Consent Decree. The SCR and D-8 would remain subject to monitoring.

_____

[16]The primary reason for this noncompliant score was the failure of one provider to complete psychiatric evaluations for most of the class members. The Monitor reported that this appeared to be a unique circumstance with one provider rather than a systemic problem in the SCR. (Doc. 1605 at 8-9).

I have considered all of these pleadings and reports in reaching my recommendations.

### III.

### A.

As for the "unresolved issues" first, as indicated at the onset of this report, the dispute arises on the pleadings because the Plaintiffs and the Monitor believe that the Defendant has wrongly closed out cases and thereafter excluded class members from further consideration in the annual compliance reviews. In contrast, Defendant urges that it has reasonably complied with the directives of this court in closing out cases for both movers and refusers. In the past, this court has looked to the Monitor for assistance in resolving such disputes and I do so again on this report and recommendation. However, in the first instance, I am compelled to give the prior Orders of the court a plain reading. In that regard, in January 2003, the court agreed with the Defendant's contention that class members "who leave the catchment area or who refuse treatment are not members of the class." (Doc. 1498). As set forth above, the Plaintiffs thereafter sought to alter or amend the Order, but only in connection with the language "or who refuse treatment," which Plaintiffs urged was subjective, imprecise and difficult to administer and unnecessary. (Doc. 1500). In support, Plaintiffs cited studies addressing the refusal phenomenon in the context of mentally ill patients and urged that the language be stricken.[17] In denying the motion, the court stated,

---

[17]A review of this pleading suggests that Defendant's argument that Plaintiffs have waived any objections related to its exclusion of refusers is without merit. Nor can I find

As both Plaintiffs and Defendant point out, class members have the right to make treatment decisions, including the decision to refuse treatment. Individuals who refuse all treatment lose their status as class members. Clearly, the Court did not intend the refusal of treatment to include sporadic refusals of medication, such as the refusal of certain medications due to side effects or pregnancy. Nor did the Court intend the definition to apply to those individuals who refuse certain treatments or certain treatment facilities only to change their minds a short time later, or to those individuals who are not competent to refuse treatment. Such interpretations would be ridiculous. . . . Refusal of treatment means a refusal of all treatment for a significant period of time.

(Doc. 1516 at 1). It does not appear from the record that Plaintiffs appealed either of these Orders or that the court further addressed the matter thereafter. Thus, while I agree with the Monitor's view that movers and refusers conceptually should be treated similarly, and, as set forth below, that 90 days (much less 30 days as per state administrative rule) may be too restrictive a time frame for the exclusion of these class members, the operative rule in this case since 2003 has been that class members who move out of the catchment area after discharge lose their status as class members. Unless the court chooses to revisit the matter, Plaintiffs' objections to the Defendant's literal application of this rule as to "movers" is overruled.

As for the so-called "refusers," the issue initially boils down to whether Defendant's unilaterally decided and applied rule, i.e., that class members who refused all treatment for a

_____

waiver of any objections related to movers. It appears that the Defendant's practice of closing cases became known to the Monitor and Plaintiffs sometime in 2005 and Plaintiffs asked the Monitor to investigate the matter in January 2006. When the import of the Defendant's exclusion practice appeared in relation to the 2006-2007 compliance review, Plaintiffs timely raised their objections.

period of 90 days lose their status as class members, comports with the court's directive that the refusal of treatment be for "a significant period of time."[18]  If it does, then as set forth below, one set of conclusions from the compliance reviews is dictated.  If it does not, as urged by the Monitor, then the different set of conclusions is dictated.

Defendant urges that, apart from clinical judgment, there is no generally accepted practice for deciding an appropriate time-frame for exclusion in the case of mental health patients who refuse treatment and that the 90-day period which it opted to adopt and apply is reasonable and consistent with the dictates of this court.  In contrast, Plaintiffs again urge that such a time frame is too restrictive to be "a significant period of time" given the nature of the class members' illnesses.  They cite to mental health studies and literature addressing the matter of refusal of treatment and urge that the Monitor's suggested time-frame of 12 to 14 months is more consistent with accepted professional practice and the purposes of the Consent Decree.

Upon my consideration of the arguments and, in particular, the findings on or about excluded class members made by the Monitor, it is apparent that a 90-day rule permitting exclusion can be too restrictive to insure the goals of the Consent Decree are met.  This is especially so where the decision to exclude is unilaterally decided and may be unaccompanied by a thoughtful clinical assessment of the individual patient before exclusion is determined. To the extent that monitoring will continue after resolution of these motions, it may be necessary and appropriate to refine the Defendant's practice and to include the Monitor's

_____

[18]I do not find it necessary to reach the numerous legal objections that Plaintiffs raise to the 90-day rule.

more routine oversight of the exclusion of class members. However, on these motions, I find that it is the better course for the court to affirm the Monitor's more limited professional judgment that those auditible refusers she has now identified be included in the assessment of the compliance reviews for 2007 and 2008. As the Monitor has brought her best judgment to the consideration of closed cases and to those class members excluded by the Defendant and identified eight "refusers" she believes should be included in those compliance reviews, her conclusions as to the import of including these persons should likewise be affirmed.

B.

As for the Defendant's substantial compliance argument, I recommend that the court not deviate from the agreed upon method for exiting the Consent Decree or the compliance levels required by the Exit Criteria in deciding these motions. While Defendant urges that this court's supervision has gone on long enough and its substantial compliance with the Exit Criteria is such that the court may conclude this litigation as to all districts and the SCR, such conclusion cannot be reached absent the court deviating from the Exit Criteria, the agreed method for withdrawal, and accepting *carte blanche,* Defendant's conclusions on closed cases. By the Stipulation, the parties agreed that the Exit Criteria "shall be the sole and exclusive method for assessing Defendants' performance and determining completion of their remaining obligations and the termination under the consent decree except as otherwise accepted by the parties and approved by the Monitors and the Court." Section I, ¶ 1. As the Monitor's reports recite, under the Exit Criteria, a district may exit the Consent Decree only when Defendant demonstrates it has achieved full compliance with both compliance levels set forth in the Exit Criteria as to each of the seven criteria against which the Defendant's

20

community services are measured.  *See* (Docs. 1605 at 5, 1573 at 5).  The court cannot approve Defendant's substantial compliance argument without ignoring these agreed upon terms in the Exit Criteria.  Defendant has offered no good reason for doing so on these motions.

As noted above, the two-prong inquiry in deciding whether to terminate a Consent Decree requires consideration of whether the basic purposes of the decree have been fully achieved and whether there is no significant likelihood of recurring violations of federal law should the decree be lifted.  *Johnson*, 348 F.3d at 1343.  For many years, the Exit Criteria have provided the agreed upon method for measuring the Defendant's performance under the Consent Decree.  As set forth below, Defendant has now achieved partial success under those criteria.  The court should stay the course and continue to use the Exit Criteria as the appropriate measure on compliance with and withdrawal from the Consent Decree.

## C.

From all of this, I reach the following conclusions.  Accepting the Monitor's position that Defendant improvidently closed eight refusers' cases and that such should be included in both the 2007 and 2008 compliance reviews and adopting the assumption that such persons had failing scores across each compliance area, the compliance review as recalculated for 2007 reveals that each district and the SCR achieved positive results in 6 of 7 community compliance areas.  While satisfying the first level of compliance, these scores do not meet the second level of compliance and none of these districts or the SCR may exit the Consent Decree.  However, in the recalculated 2008 review, D-14 and D-15 achieved positive results

on 7 of 7 of the community compliance areas.[19]  In accordance with the Exit Criteria, having

now satisfied both compliance levels, these districts may exit the Consent Decree.  As for the

SCR and D-8, they remain subject to monitoring under the decree.[20]  Since the court may also

conclude that there is no reasonable likelihood of recurring violations of federal law, I

recommend the court adopt these findings and conclusions and that D-14 and D-15 be

withdrawn from the Consent Decree.

On the other hand, if the court rejects this position and accepts that Defendant's 90-

day rule and practice is in accord with its dictates concerning those who refuse all treatment

for a significant period of time, a different set of conclusions pertain.  As reflected in the

Monitor's report on the 2007 compliance reviews, as scored by the Defendant, the SCR and

D-14 achieved positive results in 7 of 7 of the criteria.  In accordance with the Exit Criteria,

having satisfied both compliance levels, these districts may exit the Consent Decree.  As for

D-8 and D-15, each would remain subject to the decree and monitoring for failure to satisfy

the second compliance level.  However, based on Defendant's scoring in the 2008 audit, D-15

achieved positive scores on 7 of 7 of the criteria and it too, having now satisfied both

compliance levels, may exit the consent decree.  D-8, again having failed to achieve

compliance with the second compliance level, remains subject to the decree and monitoring.

_____

[19]The Monitor's graphic setting forth the three possible outcomes under her review
may be found at page 17 of Document 1605 .

[20]At the telephone conference conducted September 1, 2009, Defendant offered that its
audit of the SCR for 2009 revealed positive results on 7 of 7 criteria.  If such is confirmed by
the Monitor, the SCR may exit soon as well.

IV.

Accordingly, for the foregoing reasons, I recommend that **Defendant's Dispositive Motion to Exit Suncoast Region, Districts 8, 14 & 15 From Consent Decree Pursuant to Compliance With Exit Criteria** (Doc. 1565) and the **Defendant's Supplemental Motion to Exit Consent Decree, Dissolve Injunctions Contained in Final Judgment, Vacate Remaining Consent Decree Paragraphs 2, 35, 37 and Stipulation Regarding Exit Criteria, Terminate Jurisdiction** (Doc. 1577) be GRANTED in part. Having fully satisfied the Exit Criteria, D-14 and D-15 are authorized to exit the Consent Decree and the court's supervison and Orders thereunder. In all other aspects, the motions should be DENIED and monitoring should continue in accordance with the Consent Decree and the Exit Criteria as to the SCR and D-8.

Respectfully submitted on this
10th day of September 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
United States District Judge
Counsel of Record